## GAY v. JOHNSTON.

No. 16472—Opinion Filed July 6, 1926.

Rehearing Denied Oct. 19, 1926.

(Syllabus.)

1. **Appeal and Error—Questions of Fact—Domicile.**

Where the question of one's residence is presented to the court, such question is like any other one of fact, and its determination thereof is conclusive upon appeal if there was any evidence reasonably tending to support the same.

2. **Elections—Recount of Ballots to Contradict Returns.**

Where it is shown by the evidence that the ballots have been preserved in the same condition as when received by the election officers, and preliminary proof has been made showing that the ballots had been incorrectly counted by the election officers, such ballots may then be received in the evidence in order to contradict the returns of the precinct election officers.

3. **Same—Identity of Ballots as Question of Fact.**

Where the ballots of the voters are introduced in evidence, it is a question of fact for the jury or the court, sitting as a trier

of the facts, to determine whether they are the identical ballots cast by the voters of the precinct.

Error from District Court, Sequoyah County; Chas. C. Smith, Judge.

Action by John E. Johnston against C. M. Gay. Judgment for plaintiff and defendant brings error. Affirmed.

Frye & Frye, G. L. Grant, and Lydick, McPherren & Wilson, for plaintiff in error.

T. M. McCombs, Thos. J. Watts, and Carlile & Wall, for defendant in error.

LESTER, J. The parties to this appeal will be referred to as they appeared in the district court.

At the November, 1924, general election held in Sequoyah county, Okla., the plaintiff was a candidate for sheriff on the Democratic ticket, and the defendant was a candidate for sheriff on the Republican ticket. By the official tabulation of the votes cast for these respective candidates in Sequoyah county, C. M. Gay received 3,380 votes and John E. Johnston received 3,349 votes.

The plaintiff, on or about January 25, 1925, commenced an action in the district court of Sequoyah county, Okla., in the nature of quo warranto, contesting the election of Gay as sheriff. In his petition the plaintiff charged that many irregularities occurred in the election. The case was tried to the court and jury, and the jury returned its verdict in favor of the plaintiff, and a judgment was thereafter entered, from which judgment the defendant prosecutes this appeal.

The defendant in the court below filed a motion to quash the jury panel, alleging that Dr. Cecil Bryan, one of the jury commissioners, did not possess the qualifications of a juror, and therefore was not a qualified jury commissioner, for the reason that he had not resided in the state a year prior to the appointment of such jury commissioner. The statute provides that the qualifications of a jury commissioner are the same as those of a juror. Section 3523, C. O. S. 1921, describing the qualifications of a juror, provides:

"All male citizens residing in this state having the qualifications of electors, etc., are competent jurors, to serve on any and all grand and petit juries, within their counties."

Dr. Bryan, the jury commissioner, was called as a witness and testified in part as follows :

"Q. Doctor Bryan, you say that you have lived at Vian 30 years?

"A. Yes, sir.

"Q. Did you live there in 1923?

"A. Yes, sir.

"Q. Did you live there in 1924?

"A. I left there in 1924.

"Q. Do you remember what month?

"A. First of the year.

"Q. You left there the first of 1924?

"A. Yes, sir.

"Q. Where did you go?

"A. Fort Smith.

"Q. When did you return?

"A. Well, about the 20th day of June or the 1st of July.

"Q. How long were you away from Vian?

"A. About five and a half or six months.

"Q. About five and a half or six months?

"A. Yes, sir.

"Q. Where were you employed, or with whom were you connected during the time you were away?

"A. Holt Clinic at Fort Smith.

"Q. Holt Clinic. I will ask you to state now whether it is a fact that at the time you left Vian it was your intention to establish a home at Fort Smith, or whether you were there temporarily?

"A. Well the best—I will have to answer that question in this way. It was three or four months before that Doctor Holt wanted me to come to Fort Smith and become associated with the Holt Clinic, and wanted me to invest in it, and I did not want to go over there and invest money in it without knowing something of it, and so he said to come down and stay a while and see about it and if I liked it I could invest in it and become interested that way, and if not, no harm was done.

"Q. Did you do that?

"A. Yes, sir.

"Q. Did you decide to stay?

"A. Yes, sir.

"Q. Did you vote in the primary election in 1924?

"A. I don't think I have missed an election since statehood.

"Q. I will ask you if you established a home at Fort Smith?

"A. I claim my home to be at Vian.

"Q. And you have always claimed your home at Vian?

"A. Yes, sir."

The court, after hearing all the testimony offered on the part of the plaintiff and defendant relative to the residence of the said jury commissioner, overruled the defendant's motion to quash the jury panel.

In the case of Cornelison v. Blackwelder, 38 Okla. 1, 131 Pac. 701, the court says:

"It is manifest, therefore, that it embraces the fact of residence at a place with the intent to regard it and make it his home. The act and intent must concur, and the intent may be inferred from declarations and conduct. It is often a question of great difficulty, depending upon minute and complicated circumstances, leaving the question in so much doubt that a slight circumstance may turn the balance. In such a case the mere declaration of a party, made in good faith, of his election to make the one place rather than the other his home, would be sufficient to turn the scale."

Again, in the same case, the court uses this language:

"The intention of a person as to the place of his residence is a question of fact, to be determined by the verdict of the jury or the findings of the court, and such determination is conclusive upon appeal if there was any evidence reasonably tending to support the same."

From an examination of the record we are of the opinion that the court committed no error in refusing to quash the jury panel for the reasons alleged in defendant's motion.

The defendant next contends that the court was without authority to open the ballot boxes and allow the ballots to be counted, for the reason that the said ballots had not been preserved as required by law. The plaintiff offered a large number of witnesses to show that the ballot boxes, with the ballots intact, had been delivered by the several precinct officers to the secretary of the election board, and that after the same had been delivered to the secretary of the election board, he had deposited the same in the vaults in the office of the county clerk of Sequoyah county. We have examined the testimony of all the witnesses introduced by the parties to this action touching upon the question as to whether the ballots had been kept in such a manner as would prevent any one from taking possession of the ballots and changing or altering the same. And we are of the opinion that the plaintiff met the requirement placed upon him by showing that the ballots, after they were surrendered by the various precinct election officers to the secretary of the election board, were kept in such a manner as to prevent anyone from altering or changing the same.

It is insisted by the defendant that the official returns are prima facie proof and raise a legal presumption as to the correctness of the votes cast, to be rebutted or overcome only by clear and convincing proof to the contrary, and the evidence in this case failing, as it does, to overcome this presumption, the verdict of the jury is not supported by, but is contrary to the evidence.

Section 6151, C. O. S. 1921, reads in part as follows:

"One such certificate shall be kept by the inspector of elections, the other two shall constitute the returns, and when properly certified to shall be prima facie evidence of the correctness of the precinct vote."

The plaintiff in his petition alleged that at Long precinct No. 3, he had received a large number of votes which had been counted for the defendant; likewise at Marble City he had received a large number of votes which had been counted for the defendant, and that on account of these votes being counted for the defendant instead of for the plaintiff, the result of such error gave to the defendant a larger vote in the county than to the plaintiff.

On trial of said cause and before the ballot box from Long precinct No. 3 was opened, the plaintiff called to the witness stand Allen Bolen, who acted as inspector of said precinct on the day of the election. Said witness testified in part as follows:

"Q. When a ballot was stamped under the circle under the Republican emblems a straight Republican ticket and when they would then go over and find the ballot stamped at Mr. Johnston's name—how did they count that ballot—as to whether they counted it for Mr. Gay or for Mr. Johnston?

"Mr. Roy Frye: Objected to for the reason it is hearsay. The count would be the best testimony. Incompetent, irrelevant and immaterial.

"The Court: The objection is overruled.

"Mr. Frye: Note our exception.

"Q. Did they count it for Mr. Gay or did they count it for Mr. Johnston?

"A. Counted it for Mr. Gay.

"Q. Counted it for Gay. Give us your best judgment as to how many they counted that way.

"A. I don't know exactly.

"Q. What is your best judgment?

"Mr. Frye: Object to his judgment.

"Q. How many did you see?

"A. Well, I never counted them. I don't know how many.

"Q. Was it as many as twenty?

"A. To the best of my judgment somewhere between 20 and 30.

"Q. Between 30 and 20.

"All right."

The ballot box containing the ballots of Long precinct No. 3 was opened in the presence of the court and jury, and the ballots containing the votes for sheriff were then counted with a result that the plaintiff received 85 votes and Gay, defendant, received 123 votes. The original returns made by the precinct election board showed that Johnston received 60 votes and Gay 150. The recount from this precinct resulted in giving to Johnston a majority over Gay of 21 votes in the county.

The plaintiff introduced in court the evidence of Claud Pinkerton, who was a watcher at the Marble City voting precinct on the day of the election. He testified in part as follows:

"Q. I will ask you to state when ballots were voted this way: Where a voter voted under the Republican emblem, and went down and crossed over to Mr. Johnston, whether the ballot was counted for Gay or Johnston?

"A. State that over again. Let me get it.

"Q. When a ballot was voted, for instance, here. under the Republican emblem, and also voted here opposite John E. Johnston, state whether that was counted for Mr. Johnston or for Mr. Gay?

"A. Counted straight Republican ticket.

"Q. Straight Republican ticket?

"A. Yes, sir.

"Q. How many did you see counted in that manner, Mr. Pinkerton?

"A. Well, of course, I never kept any account of them. We talked about that——

"Q. I will ask you to state whether or not you made any objection to that manner of counting?

"A. We did. We talked about it among the officials.

"Q. Who?

"A. I did.

"Q. Who did you talk to?

"A. The judge.

"Q. Mr. Devault?

"A. Yes, sir.

"Q. The Republican judge?

"A. Yes, sir."

The recount for Marble City precinct resulted in Johnston receiving 147 votes and Gay 165. The returns made by the precinct election board gave Johnston 116 and Gay 203 votes. After the ballots were introduced in evidence the defendant filed a motion to strike the ballots from the evidence for the reason, as defendant claimed, they showed on their face that the same were fraudulent, and that when so shown, the admissibility of the ballots was a question for the court to determine. The only claim as to the fraudulent character of the ballots introduced in evidence was that a stamp was shown to have been made under the Republican emblem and that a stamp was also made in front of the name of Johnston. Some of these ballots showed that the stamp under the Republican emblem was made with black ink and the stamp in front of Johnston's name was made with pink ink. The proof also shows that the election officers had provided pads with pink and black ink on the day of the election.

The defendant insists that the appearance of the ballots introduced at the trial presented a question of law for the court to determine. The court refused to strike said ballots from the evidence, and the defendant urges that this was error.

The court in its instruction to the jury No. 4 instructed them as follows:

"You are instructed, gentlemen of the jury, that in considering this case you are instructed that there are two things for you to consider. First, so far as this case is concerned, you are instructed that the ballots of the various precincts of Sequoyah county were delivered to the clerk of the election board in the manner provided by law and you must determine from the evidence in this case by a preponderance thereof that said ballots. between the time they were delivered to the secretary of the election board of Sequoyah county by the various precinct officers were kept and preserved in the same condition as they were at the time they were voted and counted by the election officers; and second, if you find that issue in favor of the plaintiff, then you may consider and count the ballots to ascertain the number of votes cast on the office of sheriff in precincts Long No. 3 and Marble City. and from the result you find you may determine, in connection with admissions made by the parties to this case, as to whether or not the plaintiff. or the defendant. received a majority of the votes cast on that office, and in this connection this result may be modified by the admissions of the parties in the record, illegal votes cast or other matters which will be pointed out to you in other instructions."

Also in its instruction No. 5 the court instructed them as follows:

"You are instructed that it was the duty of the secretary of the county election board of Sequoyah county, after the returns had been canvassed by said board, to securely lock and retain the ballots and ballot boxes. He could not delegate his duties to securely lock and retain said ballots and ballot boxes to any other person or persons. If you find from the evidence that the secretary of the election board left his ballot boxes with the ballots contained therein and the keys to the locks of said boxes in the vault of the county clerk and that the said county clerk and other unauthorized persons had access to them, or could have had access to them at any time, either day or night; and if you further find that said ballots were exposed to the reach of persons who were unauthorized to have the charge and care of said ballots, such facts and circumstances may be considered by you as affording a reasonable opportunity of such ballots having been changed and if you further find from these circumstances, together with all other circumstances testified to in the case, that the ballots were not in the same condition as when they were voted and counted by the election officials, then you are not to consider the ballot in arriving at your verdict but you are to determine your verdict from the election returns as certified to by the precinct election board."

As will be observed, the court instructed the jury upon the question as to whether the ballots introduced in the evidence were in the same condition as when deposited in the ballot boxes by the voters. The defendant in his brief, after quoting a number of cases on the question as to whether the court should permit the introduction of such ballots, states:

"We are free to confess that the language used in these cases is somewhat confusing. The courts are found saying that the contestant must introduce preliminary proof that there was some irregularity or fraud in the count and that the ballots have been preserved in the manner required by law, and have not been tampered with, before the ballots will be introduced in evidence to contradict the official return. In other cases, and sometimes in the same case, the court will be found saying that it is a question of fact for the jury as to whether or not the ballots have been preserved in the manner required by law and have not been tampered with. In one case the court determined that it is a question of law for the trial judge to pass on; and in another that it is a question of fact for the jury."

This court in the case of Moss v. Hunt, 40 Okla. 20, 135 Pac. 282, said:

"The irregularities of the election officers in precinct 5 relative to the handling of these ballots after they were counted by the official counters in connection with all the circumstances of this case are, in our view, sufficient to discredit their character as the best evidence. We think, under the circumstances, they may be considered; but it is a question of fact for the jury or the court sitting as a trier of the facts to determine whether they are the identical ballots cast by the voters of this precinct, and to determine whether the greater weight shall be given to the ballots or the evidence of the election judges and the bystanders, who testified as to the result either as ascertained by them from the tally sheets or as stated by the election inspector at the close of the canvass."

As stated in the case just quoted, the genuineness of the ballots introduced in evidence was a question of fact to be determined by the jury or the court sitting as a trier of the facts.

The cause was submitted to the jury, and it thereafter returned a unanimous verdict in favor of the plaintiff and against the defendant. We have carefully examined all the authorities submitted by the defendant and have carefully examined the record, and we fail to find any prejudicial error in the trial of said cause. The judgment of the district court is therefore affirmed.

NICHOLSON, C. J., BRANSON, V. C. J., and HARRISON, MASON, PHELPS, HUNT, and RILEY, JJ., concur.

Note.—See under (1) 4 C. J. p. 879 §2853; 2 R. C. L. p. 194; 1 R. C. L. Supp. p. 433; 4 R. C. L. Supp. p. 90; 5 R. C. L. Supp. p. 79. (2) 20 C. J. p. 242 §331; 9 R. C. L. p. 1164. (3) 20 C. J. p. 259 §366; 9 R. C. L. p. 1165.